UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MICHAEL B. JOHNSON,

       Petitioner,

vs.                                    Case No. 3:03-cv-989-J-20MMH

JAMES V. CROSBY, etc.; et al.,

       Respondents.

_____

## ORDER

### I. Status

Petitioner, an inmate of the Florida penal system who is proceeding pro se, initiated this action by filing a "Petition for Habeas Corpus Under 28 U.S.C.A. § 2254" (Doc. #1) on November 20, 2003. He is proceeding on an Amended Petition (Doc. #5), in which he challenges his September 8, 2000, state court (Duval County) conviction for sale or delivery of cocaine. As his sole ground for relief, Petitioner contends that he was denied due process of law when, at the close of the state's case, the trial court refused a defense request for an entrapment jury instruction.

On February 4, 2004, Respondents filed an Answer in Response to Order to Show Cause (Doc. #7) (hereinafter Response). Petitioner's Reply in Opposition to Response to Petition for Writ of Habeas Corpus (Doc. #9) was filed on February 19, 2004. Thus, this case is ripe for review.

## II. Procedural History

On August 3, 2000, after a trial by jury, Petitioner was found guilty of one count of sale or delivery of cocaine.  Ex.[1] A at 378. On September 8, 2000, the trial court adjudicated Petitioner guilty of this offense and sentenced him as a habitual felony offender to a term of sixteen years of imprisonment.  Ex. D at 64-73.

On direct appeal, Petitioner raised the following claim: whether the trial court erred, as a matter of law, in denying at the end of the state's case the Petitioner's request for a jury instruction on the defense of entrapment.  Ex. B at i.  On August 13, 2001, the First District Court of Appeal per curiam affirmed the judgment of conviction, without issuing a written opinion.  Ex. C.   On May 28, 2002, Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850.  Ex. D at 1-60.   On April 25, 2003, the trial court entered an order denying the motion.  Id. at 61-63.  Petitioner appealed, and on October 20, 2003, the First District Court of Appeal per curiam affirmed the trial court's order, without issuing a written opinion.  Ex. E at 2.  The mandate issued on November 17, 2003.  Id. at 1.

Respondents contend that this action was timely filed. Response at 6-7.  This Court agrees.

---

[1] The Court hereinafter refers to the exhibits submitted in the Appendix (Doc. #8), filed February 4, 2004, as "Ex."

### III.  Evidentiary Hearing

A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief.  Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293 (1963)).  Here, the pertinent facts of the case are fully developed in the record before the Court.  Smith, 170 F.3d at 1054 (stating that a district court does not need to conduct an evidentiary hearing "if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel").  No evidentiary proceedings are required in this Court.  See High v. Head, 209 F.3d 1257, 1263 (11th Cir. 2000) (citing McCleskey v. Zant, 499 U.S. 467, 494 (1991)), cert. denied, 532 U.S. 909 (2001).  The Court can "adequately assess [Petitioner's] claim[s] without further factual development."  Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004).  Therefore, for the reasons set forth above, an evidentiary hearing will not be conducted by this Court.

### IV. The Relevant Portions of the Trial Transcript

In Petitioner's initial brief on direct appeal, the appellate attorney thoroughly summarized the pertinent portions of the trial transcript as follows:

3

In opening statement, defense counsel implied the defense theory of entrapment:

> [Y]ou will decide that the officers' actions, their driving, assertive conduct, is what caused this activity to occur. And the judge will instruct you on the law that is applicable to the evidence you will hear and how you should decide the case based on those facts.
>
> You will not hear Mr. Johnson at all driving this transaction. He is not the engine here. It is the Sheriff Officers who are out there to make drug arrests who actually drove this engine you will hear about.

(R. III, 150).[2]

Detective Cummings is an undercover narcotics detective with the Jacksonville Sheriff's Office. (R. III, 152, 153). Cummings and Detective Van Dyke conducted a buy-bust operation on February 20, 2000. (R. III, 153). Van Dyke was driving an undercover vehicle which was monitored or "wired" so that back-up officers could hear the operation. (R. III, 155-156). Cummings testified that he observed appellant walking at the corner of Gilmore and Stockton. (R. III, 156). The officers were driving down the street and turned their vehicle around in the street "to make contact" with appellant. (R. III, 156). The time was about 5:45 p.m. There was enough light to be able to see appellant. (R. III, 156). After the U-turn, appellant was on the driver's side of the vehicle operated by Van Dyke. (R. III, 157). Van Dyke called to get appellant's attention. (R. III, 157). Appellant was standing about seven feet away when Van Dyke asked if appellant knew where they could get some cocaine. (R. III, 158-

---

[2] Appellate counsel cites the trial transcript, which has been provided to this Court as Ex. A.

159). Appellant said yes, but the officers would have to take him there. (R. III, 159). Cummings said that he did not have to talk appellant into doing this. (R. III, 159). Appellant got into the vehicle, instructing the officers to proceed to 367 Nixon Street. (R. III, 159). The Nixon Street location was about a half of a block or a quarter of a mile away. (R. III, 159).

Arriving at 367 Nixon Street, appellant got out of the car. (R. III, 160). Cummings gave appellant two twenty dollar bills. (R. III, 160). Cummings watched appellant enter a house and return to the car three minutes later with two pieces of crack cocaine. (R. III, 161, 162). Appellant handed the cocaine to Detective Van Dyke. (R. III, 162). The officers drove appellant back to the area where they first picked him up. (R. III, 161, 162). There, the takedown units came in and apprehended appellant. (R. III, 162).

Cummings acknowledged that his deposition testimony was contrary to his trial testimony to the extent that he testified in deposition that appellant gave the crack cocaine to him, rather than to Van Dyke. (R. III, 163-164). Cummings explained that he was confused at the deposition, but his memory was refreshed after looking at his notes. (R. III, 165).

The officers did not make any promises in return for appellant's assistance. Nor did they have to persuade or convince the defendant to buy crack cocaine for them. (R. III, 165).

On cross-examination, Cummings conceded that he did not write any report, but he did review the reports of other officers. (R. III, 167). The assignment was for Cummings and Van Dyke "to go out and make contact with any individuals on the street", and the take down units would follow up with the arrest. (R. III, 170). Appellant was not charged with possession of cocaine after his arrest. (R. III, 173). Cummings did not know appellant

5

prior to approaching him on the street. (R. III, 174). Detective Van Dyke first approached appellant by waving to him from the car as appellant walked down the sidewalk. (R. III, 174-175). Appellant's actions at that time would be properly characterized as "minding his own business." (R. III, 175). Appellant did not wave down the officers. (R. III, 175). Van Dyke did a U-turn and pulled up to appellant. (R. III, 175). To the best of Cummings' knowledge, Van Dyke also had no prior knowledge of appellant. (R. III, 175).

Cummings testified that appellant got into the back seat of the car. (R. III, 176). In an earlier deposition, however, Cummings testified that appellant got into the front seat of the car. (R. III, 179). Cummings explained the discrepancy by stating that he had to review his notes prior to trial in order to refresh his recollection. (R. III, 179). The two detectives did not give any drugs to appellant. (R. III, 182).

Detective Van Dyke was working undercover with Cummings on February 20, 2000. (R. III, 195). Van Dyke observed appellant at the corner of Stockton and Gilmore. (R. III, 197). Van Dyke waved at appellant and appellant waved back. (R. III, 198, 216). Van Dyke turned the vehicle around and approached appellant. (R. III, 198). Detective Van Dyke asked appellant about the purchase of cocaine. Appellant said he knew where to go to get cocaine. (R. III, 199). Van Dyke did not have to coerce appellant into getting into the vehicle. (R. III, 199). Appellant entered the vehicle and directed the detectives to 367 Nixon Street.[3]  (R. III, 199). Cummings gave appellant $40.00. Appellant exited the vehicle, entered the residence at 367 Nixon Street, and soon returned with two pieces of cocaine. (R. III,

---

[3] Both Detective Cummings and Detective Van Dyke testified that they recognized the house at this address because they had previously executed search warrants at that location. Ex. A at 184, 218.

200-201).  Appellant handed the cocaine to Van
Dyke.  (R. III, 201).

        In a prior deposition, Van Dyke testified
that he had given the $40.00 to appellant.
(R. III, 210).  At trial, however, Van Dyke
testified that Cummings had given the $40.00
dollars to appellant.  (R. III, 210).  Van
Dyke said he gave the deposition without
reviewing the file of the case.  (R. III,
211).

        On cross-examination, Van Dyke claimed
that his independent recollection at trial was
better  than  his  earlier  recollection  at
deposition.   (R. III, 211).   Van Dyke's
incident  report,  however,  stated  that
appellant handed the cocaine to Cummings.  (R.
III, 214).  Van Dyke stated that the incident
report written a few days after the incident
was in error.  (R. III, 214, 223, 225).  Van
Dyke had never seen appellant prior to the
date in question.   (R. III, 217).   The
detective had no knowledge whether appellant
had any drugs on him when arrested, or whether
appellant had any money on him when arrested.
(R. III, 222).  Appellant did not ask Van Dyke
for any money or anything.  (R. III, 222).

        Officer Apelgren was one of the take-down
officers.   (R. III, 227, 228).   Apelgren
arrested appellant after the transaction was
complete.  (R. III, 230).  Apelgren did not
recall  whether  he  was  the  officer  that
searched appellant upon arrest.   (R.  III,
234).  Apelgren did not know if appellant had
any drugs, money or drug paraphernalia on him
at the time of his arrest.  (R. III, 234).

        Oda Somera is a forensic chemist at the
FDLE crime laboratory. (R. III, 242).  Somera
identified the substance retrieved from the
buy-bust operation as cocaine.  (R. III, 248).
Somera  conceded  that  she  would  have  no
knowledge of any kind of police misconduct
that may have occurred before the sample got
to her.  (R. III, 250).

On motion for judgment of acquittal, defense counsel reiterated the defense of entrapment and asked the court to consider whether the police conduct was so egregious as to constitute a violation of due process. (R. III, 252-253). The trial court denied the motion. (R. III, 253). While on the subject of entrapment, the trial judge noted that he was inclined to give the entrapment instruction requested by appellant. (R. III, 253). The prosecutor objected, arguing a lack of evidence to support the instruction. (R. III, 253). In support of the entrapment instruction, defense counsel cited the officers' testimony that appellant was merely standing on the corner or walking along the sidewalk. In addition, there was testimony that appellant was merely "minding his own business." (R. III, 258). The trial court stated the "gut feeling" that there was "some evidence" of entrapment. (R. III, 259).

Subsequently, however, the court was concerned that the defendant failed to produce evidence of "lack of predisposition." (R. III, 268, 270). Appellant relied on the same facts, i.e., that he was "minding his own business." (R. III, 271). The trial court, relying on Munoz v. State, ruled that appellant failed to produce "one iota" of evidence establishing any lack of predisposition. (R. III, 275). Accordingly, the trial court denied the requested instruction as well as appellant's related motion for mistrial. (R. III, 278). Because the trial court denied appellant's requested jury instruction on entrapment, appellant decided to testify on his own behalf. (R. III, 281, 283, 288).

Appellant was 38 years old at time of trial. (R. III, 289). Appellant acknowledged being arrested on February 20, 2000. (R. III, 289). Appellant has four prior felony convictions and 12 prior misdemeanor crimes involving dishonesty. (R. III, 289). Appellant testified that he was walking to his sister's house to get some cigarettes. (R.

8

III, 290).  Two men stopped him and waved him
down.  Appellant waved back.  (R. III, 291).
The men pulled up to him and asked if he
wanted to make some money.  (R. III, 291).
Appellant was short on money, as he needed
"cigarettes and stuff like that."  (R. III,
291).  Appellant said: "Well, doing what?".
[sic]  The man just opened the door and
instructed appellant to get in, he'll tell him
on the way.  (R. III, 291).  Appellant first
bought his cigarettes at a nearby store.  When
he exited the store a third man had gotten
into the car and said: "Come on, man, get on
in." (R. III, 292).  The other gentleman was a
black man unknown to appellant.  (R. III,
292).  Originally, there were two men in the
car, but now there were three.  (R. III, 293).
Appellant got in the car and again asked what
kind of work they would be doing.  The
response was: "I'll tell you on the way."  (R.
III, 293).  The men drove up to a house at 367
Nixon Street.  (R. III, 293).  Appellant did
not know who lived at the house.  (R. III,
293).

     Officer Van Dyke, the black male driver,
said: "Let me stop pulling you all's leg.  I
want you to -- will you go in there and get me
some crack?"  (R. III, 294).  Appellant told
them they had the wrong man.  Appellant said
he did not smoke crack or sell dope. (R. III,
294).  At that point, the third man in the
passenger seat took some money from the driver
and exited the vehicle.  (R. III, 295).
Appellant did not know whether the passenger
went in the house or down the alley because he
was talking to the driver.  (R. III, 295).
The driver then got angry because the unknown
third man did not come back with his money
after a few minutes.  (R. III, 295).  The
driver then reached down and picked up
something in his hand.  Appellant believed the
driver picked up some dope.  (R. III, 296).
Van Dyke (the driver) then sped off, stating:
"Somebody got to take the blame for this
here."  (R. III, 296).  A short while later,
Van Dyke and the other officers arrested
appellant.  (R. III, 296).

The other officers joined in the arrest.
Appellant was searched but he had no drugs,
money or drug paraphernalia on him.  (R. III,
297).  Appellant did have about 13 dollars of
his own money.  (R. III, 297).  The state then
presented impeachment evidence that one of
appellant's prior convictions was for
possession of drug paraphernalia.

After appellant's testimony, the trial
court ruled that appellant was then entitled
to the jury instruction regarding entrapment.
(R. III, 309).  At the jury charge conference,
the trial court went over the entrapment
instruction as proposed by defense counsel.
(R. IV, 321-324).

In closing, the prosecutor argued that it
is not entrapment if the defendant had the
predisposition to commit the crime. (R. V,
344, 348).   In particular, the prosecutor
argued that appellant was not entirely
truthful in denying involvement in drug-
related activity since one of his prior
convictions was for possession of drug
paraphernalia, a drug pipe.  (R. V, 351).

The trial court instructed the jury on
the defense of entrapment.  (R. V, 368-371).
The jury returned a verdict of guilty as
charged.   (R. V, 378).   The trial court
sentenced appellant to a term of 16 years as
an habitual felony offender.  (R. I, 57, 58).

Ex. B at 2-11.

## V.  Findings of Fact and Conclusions of Law

As noted previously, Petitioner contends that he was denied

due process of law when, at the close of the state's case, the

trial court refused a defense request for an entrapment jury

instruction.

10

Respondents contend, and this Court agrees, that Petitioner's federal due process claim under this ground has been procedurally defaulted. Petitioner asserts that he raised this ground on direct appeal; however, from a review of the record, it is clear that he raised the claim as an error of state law only. He did not cite any federal constitutional provisions in his brief on direct appeal, nor did he allude to any federal claim. Thus, his federal claim has not been exhausted.

A petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state remedies. See Castille v. Peoples, 489 U.S. 346, 349, reh'g denied, 490 U.S. 1076 (1989); Rose v. Lundy, 455 U.S. 509 (1982).

> In order to be exhausted, a federal claim must be fairly presented to the state courts. Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). "It is not sufficient merely that the federal habeas petitioner has been through the state courts . . . nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made." Kelley, 377 F.3d at 1343-44 (citing Picard, 404 U.S. at 275-76, 92 S.Ct. at 512 and Anderson v. Harless, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982)). Rather, in order to ensure that state courts have the first opportunity to hear all claims, federal courts "have required a state prisoner to present the state courts with the same claim he urges upon the federal courts." Picard, 404 U.S. at 275, 92 S.Ct. at 512 (citations omitted). While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court "such that a reasonable reader would

11

> understand each claim's particular legal basis
> and specific factual foundation." Kelley, 377
> F.3d at 1344-45 (citing Picard, 404 U.S. at
> 277, 92 S.Ct. at 513).

McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005).

Generally, a federal habeas petition should be dismissed if the petitioner has failed to exhaust state remedies. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 10 (1992). A federal court need not dismiss the petition to allow for exhaustion of state remedies, however, if such a dismissal would be futile.

> [I]f the petitioner simply never raised a
> claim in state court, and it is obvious that
> the unexhausted claim would now be
> procedurally barred due to a state-law
> procedural default, the federal court may
> foreclose the petitioner's filing in state
> court; the exhaustion requirement and
> procedural default principles combine to
> mandate dismissal.

Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999) (per curiam) (citing Snowden v. Singletary, 135 F.3d 732, 737 (11th Cir.), cert. denied, 525 U.S. 963 (1998)).

It would be futile for this Court to dismiss this unexhausted federal due process claim because it should have been raised on direct appeal. Thus, Petitioner's federal claim has been procedurally defaulted. See Bailey, 172 F.3d at 1305.

"Procedural defaults in state courts will foreclose federal court review, absent a showing of cause and prejudice." Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 770 (11th Cir. 2003) (citing Wainwright v. Sykes, 433 U.S. 72 (1977)), cert. denied, 540

12

U.S. 1222 (2004). "[A] petitioner may gain federal review of an otherwise procedurally defaulted claim if he can demonstrate both cause excusing the default and actual prejudice resulting from the bar." Hill v. Jones, 81 F.3d 1015, 1022-23 (11th Cir. 1996) (citations omitted), cert. denied, 519 U.S. 1119 (1997).

"[A] federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice." Fortenberry v. Haley, 297 F.3d 1213, 1222 (11th Cir. 2002) (per curiam) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)), cert. denied, 538 U.S. 947 (2003). The fundamental miscarriage of justice exception is only available in extraordinary cases upon a showing of "'actual' innocence" rather than mere "'legal' innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 926 (2002).

Here, Petitioner has not shown both cause and prejudice. Furthermore, he has not demonstrated that he meets the fundamental miscarriage of justice exception. Thus, the Court need not address his federal due process claim.

The exhausted portion of the claim raised in the Petition presents an issue of state law that is not cognizable on federal habeas review. See Response at 7-9. Furthermore, even assuming

13

arguendo that Petitioner's federal claim had been properly exhausted, it is without merit.[4]

"[A] successful entrapment defense consists of two elements: 1) government inducement of the crime, and 2) lack of predisposition on the part of the defendant." United States v. Ryan, 289 F.3d 1339, 1343 (11th Cir. 2002) (per curiam) (citing United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995)). With respect to the government inducement element, "evidence of the government's mere suggestion of a crime or initiation of contact is not enough. Instead, government inducement requires an element of persuasion or mild coercion." Id. at 1344 (quoting Brown, 43 F.3d at 623). Persuasion or mild coercion may be shown if a defendant "demonstrat[es] that he had not favorably received the government plan, and the government had to 'push it' on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." Id. (quoting United States v. Alston, 895 F.2d 1362, 1368 (11th Cir. 1990)).

Here, there was simply no evidence of government inducement presented during the state's case. Thus, the trial court properly denied the request for an entrapment instruction at that stage of the proceeding. For this reason, and for the reasons stated by the

---

[4] This Court cannot defer to the adjudication of this claim by the First District Court of Appeal since no federal claim was before that court.

14

Respondents in their Response, this claim is wholly without merit. See Response at 9-16.

Therefore, for the above-stated reasons, the Amended Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Amended Petition (Doc. #5) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.    The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

3.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this ___3rd___ day of October, 2005.

_____
UNITED STATES DISTRICT JUDGE

ps 10/3
c:
Michael B. Johnson
Ass't Attorney General Karen Armstrong

15